Jeffrey L. Rosenberg (JR-3597)
JEFFREY L. ROSENBERG
  & ASSOCIATES, L.L.C.
Attorneys for Plaintiff, Jay Koza
46 Morgan Drive
Old Westbury, New York 11568
(516) 626-1325

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ APR 2 9 2009

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV-09 1761**

-------------------------------------------X

JAY KOZA

        **Plaintiff**

- against -

PANGEA3, LLC, and DAVID PERLA
        **Defendants**

-------------------------------------------X

Civ.  PLATT, J.

BOYLE, M.

**COMPLAINT and
DEMAND FOR JURY TRIAL**

Plaintiff, Jay Koza, ("Koza" or "Plaintiff"), as and for his Complaint against Defendants,

Pangea3 LLC ("Pangea" or the "Company"), and David Perla ("Perla"), alleges as follows:

## JURISDICTION

1.    This Court has jurisdiction over and with respect to this matter, pursuant to 28

U.S.C.A. § 1332, in that there is complete diversity of citizenship between Plaintiff and all of the

Defendants, and the matter in controversy herein is in excess of $75,000.00.

2.    This Court has subject matter jurisdiction to determine the federal securities law

claims asserted in this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.    This Court has supplemental subject matter jurisdiction to determine the state law

claims asserted in this action pursuant to 28 U.S.C. §1367(a).

## PARTIES

4.    Plaintiff is an individual, residing at 1884 Leslie Lane, Merrick, New York 11566.

5.    Upon information and belief, Defendant, Pangea, is a Limited Liability Company

formed and existing under the laws of the State of Delaware, which maintains its principal office

for the conduct of its business and operations at 102-B, Ground Floor, Leela Business Park, Andheri-Kurla Road, Andheri East, Mumbai 400 059, India; and which maintains an ancillary sales and marketing office at 18 East 41st Street, 18th Floor, New York, NY 10017.

6.      Upon information and belief, Defendant, Perla is an individual who resides in and is a resident of the State of New Jersey.

7.      Upon information and belief Pangea 3 is in the business of providing a wide variety of document review and legal outsourcing services to United States and multi-national companies through its staff which provides such services and which is located in India, and through various independent, third party strategic partners and alliances, located in the United States.

8.      Upon information and belief, Sanjay Kamlani ("Kamlani"), is Co-CEO and a director of Pangea, and is the person responsible for and who oversees the overall operation and management of Pangea, and its corporate policies; and is responsible for and oversees new product development. Kamlani operates out of Pangea's principal office, located in Mumbai, India.

9.      Upon information and belief, Perla, is Co-CEO and a director of Pangea, and is responsible for overseeing the day-to-day sales and marketing activities of Pangea; including hiring and managing the Pangea sales and marketing staff, and supervising Pangea's efforts to identify and partner with certain independent third party strategic partners and joint venturers, with a view to entering into certain strategic marketing, sales, and servicing alliances.

10.      At all relevant times, Perla and Kamlani, as the Co-CEO's of Pangea, as principal shareholders and controlling and/or managing members, or the equivalent thereof, of Pangea, are "controlling persons" with respect to Pangea, as that term is defined in Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), in that Perla and Kamlani, controlled and control, directly or indirectly, the activities, business, management and affairs of Pangea.

## NATURE OF ACTION

11.     Plaintiff brings this Action for: (a) breach of fiduciary duty, and breach of contract, including breach of an implied covenant of good faith and fair dealing, to recover damages in the form of commissions and other compensation for and with respect to the generation and/or procurement of new business for Pangea by Plaintiff within the guidelines of his "Employment Agreement", which business Plaintiff was exclusively or primarily responsible in generating, and which commissions have been denied to Plaintiff by Defendants' willful and precipitous termination of his employment after such business and the underlying relationships had  already been established and substantially procured by Plaintiff, as the means by which Defendants failed and refused to pay commissions to Plaintiff; (b) for breach of fiduciary duty, (c) for Securities Fraud, including violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (d) for liability as a control person; (e) for a declaratory judgment declaring that the Confidentiality and Non-Solicitation Agreement that Plaintiff was compelled to sign at our about March 26, 2009, just prior to his employment termination is void and unenforceable, and (f) and Plaintiff seeks punitive and exemplary damages for the willful, intentional and contumacious breach of fiduciary duty, separate from the terms of the Employment Agreement, that was engendered in connection with Plaintiff's employment termination and the putative avoidance with respect to the payment of said commissions, and the denial of the transfer and delivery of the securities/options contemplated under Plaintiff's Employment Agreement with Pangea.

## FACTS COMMON TO ALL CAUSES OF ACTION

12.     In or about September, 2008, while he was employed at Huron Consulting Group, Plaintiff was initially contacted regarding employment with Pangea by Stephen King, of Hobson Associates, an executive employment search firm, retained by and/or working on behalf of Pangea.

13.     Mr. King told Plaintiff that Pangea had a small document review business forming in India; and was interested in expanding that business to major corporations in the United States and around the world.

14.     When Plaintiff expressed interest, Stephen King arranged an initial appointment for Plaintiff to meet with Perla to discuss this employment opportunity.

15.     At the conclusion of that initial interview, Perla advised Plaintiff that he thought he would be a perfect fit for Pangea, and would be valuable member of Pangea's senior team management team.

16.     Thereafter, through the course of three interviews, Plaintiff met with Perla, then Co-CEO Larry Graev, Chairman of the Company, Sanjay Kamlani, Co-CEO, and two Vice Presidents, Kevin Colangelo and Jonathan Goldstein. These meetings took place between on or about the end of September, 2008 and through October 10, 2008, and were held in Pangea's New York City offices, except for the meeting with Larry Graev, which was held at the offices of Glen Rock Capital, in New York City; and additional communications, including by telephone and e-mail were effected at Plaintiff's residence. Follow up discussions were pursued by Perla by virtue of telephone conferences and e-mails conducted or received at Plaintiff's residence office.

17.     During the course of these meetings and discussions, and in the course of continuing telephone calls and e-mails transmissions, Perla recruited and solicited Plaintiff to

accept take up employment with Pangea, in particular in light of Perla's view that Plaintiff met all of Pangea requirements and needs for its intended business expansion.

18.     In pursuance of those overtures, and to induce Plaintiff to accept employment with Pangea, and to become a part of Pangea's senior management and business development team, Perla discussed with and made the following express representations to Plaintiff, each of which was false and misleading:

(a)     Perla told Plaintiff that if he "came on board", Pangea would be relying on Plaintiff's industry understanding and experience and his accomplishments, performance and reputation in the "legal services industry", such that Plaintiff would be a material and essential part of the small and close-knit senior management team that would build and expand the business of Pangea over the ensuing three to four years;

(b)     Perla advised Plaintiff that Pangaea's equity investors, including "Sequoia Capital" and "Glenrock Capital" were looking to transform the Legal Processing Off Shore industry, and then achieve an exit scenario by selling the business of the Company within three to four years;

(c)     Perla stated that he had accepted a low salary with a high equity interest so that he could reap the rewards of this business development and exit plan; and confirmed that he and Kamlani would make strenuous efforts to implement this short-term exit scenario to capitalize on and benefit from the anticipated development and expansion of Pangea's business, and its concomitant exponential increase in market value—which he anticipated would be achieved by selling the stock of Pangea in an Initial Private Offering ("IPO"), or other form of merger, reverse merger, acquisition or combination of such methodologies, pursuant to which senior management and the principal equity shareholders would "cash out" within three years' time.

(d)     For this reason and on this basis, Perla told Plaintiff that all commissions payable to him would be structured for a period of not more than three years, to avoid burdening

5

any "purchaser" with on-ongoing obligations to make such payments after any contemplated "sale of the Company";

      (e)    Perla told Plaintiff that this would be an easily attainable goal for, among other reasons, that the cost per page to review a legal document in India was about 10 cents, as compared with a cost of about $1 per page for a law firm's review of legal documents in the United States. Therefore, he asserted that it was virtually certain that Pangea would be able to capture a sufficient and/or substantial part of the available market for legal document review and outsourcing services so that by the end of the third year after his commencement of employment, the company would be a "cash cow", which would make Pangea an extremely attractive "acquisition target, and that a prospective transaction was virtually certain to be accomplished, thus facilitating a "cash out" by insiders, including Plaintiff. More specifically, Perla told Plaintiff that by their cooperative efforts they would make each other very wealthy men;

      (f)    Perla told Plaintiff that he would be guaranteed participation in this exponential increase in market value resulting from the successful "build-out" of Pangea by his assurance and representation that Plaintiff would receive an up-front "option", to be granted at the very outset of his employment, pursuant to Pangea's employee stock option plan (the "Plan"), to purchase up to 200,000 shares of the Company's sole class of common stock, at a per share strike price of $ .20, which would be equal to the fair market value of one share of Pangea's common stock on the date of the grant—which options were to vest under the terms of the Plan;

      (g)    Perla told Plaintiff that the market value of his stock which would vest under the Plan on or before the third anniversary of his employment agreement, would have a market value of not less than $1.5 million, and was likely to substantially exceed $2 million, or more, in market value;

      (h)    To further induce Plaintiff to take up Perla's solicitations and importunities of employment with Pangea, Perla also represented to Plaintiff that he would be able to further leverage any commissions he might earn under the prospective employment agreement by a

provision that would be included in Plaintiff's employment agreement that would allow him to convert any commissions Plaintiff might earn to warrants to purchase additional common stock of the Company, at a warrant and/or option price to be set by the company's board of directors in good faith;

(i)     Perla told Plaintiff that he wanted him to agree to a Non-Compete Agreement and arrangement, so as to make any prospective deal more attractive to any prospective purchaser of the Company. Plaintiff would not agree to that provision, but did indicate he would agree to a limited and watered down Non-solicitation provision that did not preclude him from earning a living;

(j)     In addition, when Perla told Plaintiff that his employment would be terminable at will and without cause, Plaintiff objected.  In response, Perla emphasized that as the senior vice president and as a managing director of the Company, only Perla ranked higher than him in the United States, and that Plaintiff needed to trust him not to exercise that provision except in the most dire of circumstances; and Perla stated that Plaintiff had to trust him since they would be working so closely, and in mutually cooperative and supportive roles.  To punctuate this assurance, Perla stated the following to Plaintiff, in words or substance: "Sign business, create a legal vertical, and work with me to increase sales and you will walk away a very rich man."

(k)     In response, Plaintiff shook Perla's hand and told him he would take him at his word; and would trust him not to cause or effect the termination of Plaintiff's employment except for substantial cause.

19.     In pursuance of the foregoing and other discussions and representations, Plaintiff thereafter consummated and entered into that certain Employment Agreement, dated October 13, 2008 (the "Employment Agreement"), pursuant to which Plaintiff was employed as an at-will employee and commissioned sales agent, and commenced his employment with Pangea on October 13, 2009. (A copy of the Employment Agreement is annexed hereto as Exhibit "A").

20.   Pursuant to the terms of the Employment Agreement, Plaintiff was retained and employed as Senior Vice President & Managing Director-Discovery Services, reporting to Perla as the United States-based Co-CEO; and the Agreement specified that he was to be resident in Pangea's New York offices.

21.   Reflecting the foregoing discussions which induced Plaintiff to enter into the Employment Agreement, and on which Plaintiff reasonably relied and had a reasonable basis to rely on, Pangea approved and issued the following press release on November 19, 2008, following the execution of the Employment Agreement. (A copy of Pangea's November 19, 2008 press release is annexed hereto as Exhibit "B".)

22.   In support of the existence of a special fiduciary duty between and among Perla and Plaintiff, in addition to that which may otherwise exist at law, were the repeated discussions, representations and assurances given to Plaintiff by Perla that they would be interdependent partners in the build-out of the Company, and thus in the economic benefits to be derived from the implementation of the proposed exit strategy.

23.   In addition, also supportive of this special fiduciary duty owed by Perla to Plaintiff is the fact that the Employment Agreement expressly confirmed that Plaintiff's responsibilities included: generating and managing individual sales, on a national basis, to new and existing clients (other than clients and prospects currently assigned to other sales persons); leading Pangea's discovery domain, including document review; and participating as a member of Pangea's senior management team. In addition, Plaintiff was responsible for developing strategic relationships (channel partnerships) in Pangea's discovery and litigation channel.

24.   These roles and activities necessarily involved and required a special, mutually dependant and interdependent working relationship between Plaintiff and Perla; and Perla

8

expressly told Plaintiff he could rely on this special nexus and working relationship to assure himself that he would be a participant in any discussions and decisions that would adversely impact his employment and the compensation he was to receive, which, in turn, was mutually interdependent with and impactful upon Perla's own economic interest; and which Perla would not jeopardize. By way of example, Perla told Plaintiff that he had an interest in seeing Plaintiff's entire Plan of options continue to vest over the four year or shorter period up to the execution of the exit scenario, as that would provide Plaintiff with even more incentive to increase business and sales, which, in turn, would increase Perla's economic benefits in regard to the exit scenario.

25.    Upon information and belief, in the foregoing role and position, Plaintiff was the second most senior office of Pangea in the United States, reporting only to Perla.

26.    The material terms of Plaintiff's terms of compensation under the Employment Agreement were as follows:

(a)    <u>Salary</u>: For his services as Senior Vice President, Plaintiff was to be paid a base salary of $195,000.00 per annum; provided however, during the first 12 months of Plaintiff's employment, Pangea was to advance to Plaintiff the sum of $4,000.00 per month as a draw against Plaintiff's earned and to be earned commissions; and any commissions payable to Plaintiff any at time were to be reduced by the amount of the draw previously paid to Plaintiff;

(b)    <u>Perks</u>: Plaintiff was entitled to have the Company provide him with a Blackberry or other Smartphone of Plaintiff's reasonable choice, a computer and printer for all company related matters; and

(c)    (i) <u>Commissions, Plaintiff's Accounts</u>: Plaintiff was to be entitled to payment of commissions for all new clients exclusively or primarily originated by him, and for all new business generated exclusively or primarily by Plaintiff from existing clients. The commission for the generation of this business was to be 7% of gross sales during the first year in which services are performed, 5% in the second year and 3% in the third year—"provided that [Plaintiff was] employed by Pangea at the time such commission is earned";

(ii) <u>Commissions-Document Review</u>: For new clients purchasing document review services, or new document review business from existing clients, originated by Plaintiff in conjunction with other members of Pangea's sales team, as approved by Perla, Plaintiff was entitled to receive a commission of 3.5% of gross sales generated during the first year in which such document review services are performed;

(d)    Commissions-Others' Accounts or Jointly Acquired Accounts: For new clients, or new business from existing clients, originated by Plaintiff in conjunction with other members of the Pangea's sales team, the percentage commission payable to Plaintiff was to be reduced to an amount reasonably determined by Pangea's Co-CEO;

(e)    Stock Options: Promptly after the start date of Plaintiff's employment (October 20, 2008), Plaintiff was to receive a grant under the Plan of stock options to purchase 200,000 shares of Pangea common stock, pursuant to the terms referenced above. The options were to vest at the rate of 25% per year on each anniversary date of Plaintiff's employment commencement date. In addition to the initial grant, the Employment Agreement provided that if Plaintiff was employed by Pangea on the one year anniversary of his employment commencement date, he would be eligible for grants of additional options, at a per share strike price equal to the fair market value of one share of Pangea's common stock on the date of such subsequent grant—with each such additional grant being subject to the same four year vesting requirements as governed the initial grant;

(f)    Warrants:    As discussed above, Plaintiff was entitled to elect to receive warrants to purchase common stock in lieu of commissions earned to the extent that he generated in excess of $3 million in revenue during his first 12 month's of employment. In such event, Plaintiff was entitled to receive an amount of warrants equal to the dollar value of the excess commissions that Plaintiff would otherwise have been paid for generating revenue in excess of $3 million.

(g)    Period of Employment:    Plaintiff's employment was stated to be "at will", and was terminable at any time, with or without cause. In addition, it was stated that the Employment Agreement could only be amended or modified by a written agreement signed by Plaintiff and a Co-CEO of Pangea; and was to be governed by the laws of the State of New York.

27.    Despite the provisions of the Employment Agreement, no form of any non-solicitation Agreement was presented to Plaintiff for his consideration and/or for purposes of negotiating the terms, scope and ambit thereof, and Plaintiff did not sign or agree to any non-solicitation agreement, or the terms of any non-solicitation agreement or arrangement, concurrent with, or proximately after the execution and delivery of the Employment Agreement.

28.    At no time before or after the execution of the Employment Agreement did Defendants ever deliver to or otherwise provide Plaintiff with access to a copy of the Plan.

29.    At no time before or after the execution of the Employment Agreement, and at no time after Plaintiff's employment commenced thereunder did Defendants ever deliver the Options to Plaintiff as contemplated by the Employment Agreement.

30.    Notwithstanding the foregoing terms, subsequent to the execution of the Employment Agreement, Perla directed Plaintiff to withhold from pursuing new business from the accounts of others, and to limit his efforts to activities under ¶"26(c)(i) and (ii) above, and to especially assist in the development and build-out of the Company by concentrating on the development of "strategic relationships" in the company's discovery and litigation channels.

31.    Perla attributed great importance to such activities, noting that the development and implementation of such strategic relationships, alliances and partnerships would allow Pangea to present a broader platform of services in the eyes the market place, which, in turn, if successful, would be translated into increased revenue sharing from the activities with partners and joint-venturers, and would allow the Company and such partners to offer services that the Company might not be able to offer or deliver for several years.

32.    Perla stated that these strategic relationships and alliances were intended to and would allow such prospective partners to solicit business for Pangea, thus exponentially increasing the Company's sales efforts and market reach.

33.    Perla and Plaintiff discussed the value and benefit of pursuing strategic relationships and alliances with "platform companies" that offered diverse services separate and away from document review services, such as companies that specialized in electronic discovery, and various software services that provided the ability to efficiently conduct and implement document review and management in large cases, and software and hosting facilities.

34.    Perla especially noted and stated that the income and cash flow enhancement that would result from the implementation of such strategic relationships and alliances would be translated into geometric increases in market value, since any sale of assets or stock, or another

11

form of transaction, would be anticipated to be accomplished at a multiple of earnings in regard to the planned exit scenario.

35. Perla discussed with Plaintiff the fact that although the Employment Agreement, as initially executed, contemplated and imposed the obligation to develop such strategic relationships, Perla wanted Plaintiff to emphasize his efforts to a greater extent in this area, but not inconsistent with his efforts to generate document review accounts.

36. Specifically, Perla observed that the original Employment Agreement failed and omitted to include a compensation component for services contemplated to be performed by Plaintiff in pursuance of identifying, pursuing and achieving strategic alliances. To induce Plaintiff to increase his efforts in this area, including through his established prior contacts and business sources, among others, Perla represented that Plaintiff would receive a commission equal to 7% of the gross sales derived from any joint venture and/or strategic alliance sales that he was responsible for procuring, or such greater amount and/or percentage as might be approved by the Pangea Board of Directors from time to time. As compared to the commission income specified in the Employment Agreement, no time limitation was placed on Plaintiff's ability to earn this element of Plaintiff's compensation; and this was in deference to the importance of developing such business for the Company.

37. As a result of Perla's directions in regard to Plaintiff's efforts to develop these strategic relationships and alliances, Plaintiff made special efforts to develop this business segment; and was successful in developing several valuable strategic alliances that are currently being implemented, or about to go on line.

38. As a Co-CEO and a director of Pangea, Perla owed a fiduciary duty to Pangea; and therefore owed a fiduciary duty to act in the best interests of Pangea and its other officers, employees and representatives, including a duty not to deprive Pangea and/or such officers, employees and representatives working for and on behalf of Pangea of any corporate opportunities; and not to deprive Pangea and such persons of the benefits of their transactional

12

developments and efforts undertaken and performed for and on behalf of Pangea, including those for which such persons expected and had agreed with Pangea to be compensated.

39.    In particular, as the person charged with hiring, managing and overseeing Pangea's sales and marketing force, and as the person whom Plaintiff was asked to work with directly in a partner-like, cooperative and mutually supportive arrangement, and as the person to whom Plaintiff reported directly, Perla had a special and fiduciary relationship to and with Plaintiff, which resulted by reason of their relationship as the two most senior officers of Pangea in the United States, and by virtue of the fact that Plaintiff necessarily reposed and was required to repose a special trust and confidence in and with respect to Perla in his efforts to develop the business of the Company and to earn incremental compensation; and because Plaintiff necessarily relied on, and was required to rely on, the good faith and fair dealing of Perla to work constructively and cooperatively with Plaintiff in the development of Pangea's legal outsourcing services, and with respect to the development and expansion of the foregoing strategic relationships and arrangements, which formed a material part of, and on which Plaintiff's compensation was and would be based.

40.    In entering into the Employment Agreement, and in agreeing to use his experience and understanding of the market for outsourcing legal services and related products to build out the Company, Plaintiff relied on this position and condition of trust and confidence that he reposed in Perla, and on the fact that Perla had represented to him that would act in accordance in a manner that would not contumaciously deny and preclude Plaintiff from receiving and benefiting from the legitimate fruits of his labor.

41.    In particular, Plaintiff relied on and reposed such special trust and confidence in Perla because his ability to build-out and expand the business of the Company cooperatively with Perla was an essential and material element that would enable Plaintiff to earn the compensation otherwise designated for those services; and because Plaintiff was compelled and induced by Perla to rely on his good faith in not exercising a right to terminate Plaintiff's employment solely to

prevent Plaintiff from realizing and receiving his commission compensation under the Employment Agreement, including as was supplemented by Plaintiff's subsequent directions by Perla to concentrate more on developing strategic relationships and alliances.

42.    In addition, Plaintiff specially relied on the fiduciary duty of Perla in regard to entering into the Employment Agreement in regard to his compensation to be derived by the grant of options and warrants to purchase and obtain Pangea common stock.

43.    The purchase and or obtaining of those securities in the form of options and/or the right to obtain warrants to purchase Pangea common stock was a material and essential element and consideration in inducing Plaintiff to enter into the Employment Agreement; and but for the grant and delivery of the options and the ability to derive substantial economic benefit and compensation therefrom, Plaintiff would not have entered into the Employment Agreement.

44.    In particular, in entering into the Employment Agreement, as the method and means of "purchasing" and "obtaining" the options and the right to obtain the warrants in and to the purchase of the common stock of Pangea, Plaintiff reasonably relied on the good faith and fiduciary duty of Perla to work cooperatively with him in building out and developing the business of the Company, as the means and facility to earn the incremental compensation he was to derive from such options and warrants; and he reasonably relied on the fact that Perla, in words and substance, had expressly confirmed that he would not cause Pangea to terminate his employment as the means to defeat him from realizing the economic benefits and compensation he was promised if he cooperatively worked with Perla and assisted the Company in building out its business in pursuance of the exit scenario.

45.    On April 2, 2009, Perla, acting for an on behalf of Pangea, precipitously terminated Plaintiff's employment.

46.    Upon information and belief, this termination was for the express and ulterior purpose of avoiding payment to Plaintiff with respect to various compensation for accounts and business that he was responsible for procuring for Pangea as at that date, which was substantially

finite and/or which would become fully fixed and certain with the passage of time, or upon certain purely administrative and logistical matters.

47.    Notably, this precipitous termination came immediately after meetings had concluded in pursuance of which it was substantially confirmed and it readily appeared that Plaintiff had been primarily responsible for achieving a large document review services agreement and arrangement with Credit Suisse as the Credit Suisse's litigation matters, and after Plaintiff had estimated for Perla that such contract was likely to generate $10,000,000.00, or more, in sales, not inclusive of the business that might be derived from the law firms working for Credit Suisse, who had attended one or more information sessions in regard to Credit Suisse's decision to enter into a contract and arrangement for document review with Pangea.

48.    Upon information and belief, prior to his conduct and that of Pangea in terminating Plaintiff's employment specifically or primarily for the reason of avoiding the payment of Plaintiff's commissions and the realization of substantial economic benefits to be derived from the options and/or the warrants, Perla, also acting for and on behalf of Pangea in a similar capacity, terminated the employment of one or more prior officers, employees, or representatives of Pangea just before or after the substantive accrual of substantial economic benefits, so as to similarly preclude and cut off such persons from receiving such benefits and compensation after they had been substantially responsible for generating new legal out-sourcing business and accounts that required Pangea to pay or extend such benefits to such persons.

49.    Upon information and belief, the persons so terminated included, but may not be limited to: Daniel Savitt, vice president-legal services, and Lata Setty, senior vice president of legal services and a founder of Pangea.

50.    Neither Pangea or Perla disclosed these prior terminations, nor disclosed Pangea's hidden intent to terminate Plaintiff at a time which was after Plaintiff had done sufficient work to require the payment of commissions and other economic benefits to him, but before such

commissions and/or economic benefits accrued or became payable by reason of the at-will termination provision of the Employment Agreement.

51.    On or about March 26, 2009, upon information and belief, with a view to the imminent termination of Plaintiff's Employment, Perla informed Plaintiff that the parties had failed to execute a confidentiality and non-solicitation agreement, as contemplated in the Employment Agreement.

52.    When Plaintiff balked at the suggestion of such a belated signing, in words or substance, Perla made its clear to Plaintiff that if he did belatedly sign this agreement, of the date of the date of the Employment Agreement (October 13, 2008) his employment would be terminated immediately without further discussion.

53.    As a result, Plaintiff assessed that he had very little discretion to negotiate the terms of this important agreement.

54.    Thus, although Plaintiff subsequently executed a the form of Confidentiality and Non-Disclosure Agreement annexed hereto as Exhibit "C", this was without further or contemporary consideration, the Agreement was not actually or substantively agreed to as of October 13, 2008, despite the statements therein to the contrary, and such agreement was substantially imposed on Plaintiff without any volitional intent.

## COUNT I

### AGAINST PANGEA
### (Breach of Contract)

55.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 54 of this Complaint.

56.    The Employment Agreement, as executed, included and encompassed an implied covenant of good faith and fair dealing on the part of Pangea and each of its officers, directors and representatives with respect to transactions with Plaintiff.

16

57.     Perla, acting in his capacity as Co-CEO of, and acting for an on behalf of Pangea, breached that implied covenant of good faith and fair dealing by, among other things, terminating Plaintiff's employment precisely, and/or primarily, in order to avoid paying him and disenfranchise him with respect to the commissions on sales and transactions, including in relation to strategic relationships and alliances, that were already or virtually completed, or certain to be completed, by virtue of or primarily by virtue of the efforts, contacts and dealings of Plaintiff under the Employment Agreement, but for minor formalities and/or the passage of time and/or the development of operating procedures and working relationships which were waiting to be implemented.

58.     By reason of the foregoing breaches Plaintiff is entitled to recover such damages as may be proved at trial.

59.     In addition, since Pangea failed to discuss, negotiate and/or attempt to obtain Plaintiff's understanding in regard to the terms, scope and ambit of any Non-Solicitation Agreement contemporaneous with the execution and delivery of the Employment Agreement, Pangea waived its right to compel Plaintiff to later execute any such agreement, proximate to Plaintiff's termination of employment.

60.     Thereafter, Perla belatedly proffered a form of Non-Solicitation Agreement at or about March 26, 2009, expressly stating that Plaintiff was required to execute this Agreement, or his employment would not continue; and Plaintiff was therefore subsequently relegated and compelled to execute such Agreement even thought he did not agree with the terms thereof.

61.     Accordingly, Plaintiff is also entitled to a declaratory judgment, declaring that such Agreement was without consideration, was coerced and it therefore void and unenforceable.

62.     In addition, since the foregoing breaches and related conduct was so willful and contumacious and constituted such a marked and depraved departure from what is commercially reasonable and the societal norm, alone and in conjunction with Defendants' conduct in relation to one or more other employees of the Company, similarly situated, Plaintiff is entitled to recover

punitive and exemplary damages in the amount of not less than $1million, or such greater amount as may be determined at the a trial of this matter.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

63.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 62 of this Complaint.

64.    By reason of Defendants' breach of fiduciary duty existing by virtue of, and based upon the special relationship between Perla and Plaintiff, and by reason of the fact that Plaintiff specially and necessarily relied on and reposed special trust and confidence in Perla, in and with respect to their alleged mutually beneficial and interdependent and cooperative efforts to build-out and develop the business of Pangea, Plaintiff lost the benefits of work, labor, endeavors and accomplishments for and on behalf of Pangea, and is entitled to damages for that breach in an amount to be determined at trial.

65.    In addition, since the foregoing breach of fiduciary duty and related conduct was so willful and contumacious and constituted such a marked and depraved departure from what is commercially reasonable and the societal norm, alone and in conjunction with Defendants' conduct in relation to one or more other employees of the Company, similarly situated, Plaintiff is entitled to recover punitive and exemplary damages in the amount of not less than $1million, or such greater amount as may be determined at the a trial of this matter.

## COUNT III

### AGAINST ALL DEFENDANTS FOR FEDERAL SECURITIES FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACTAND RULE 10b-5 PROMULGATED THEREUNDER

66.    Plaintiff repeats and realleges the allegations made in paragraphs 1 through 65 of this Complaint.

18

67.  Defendants intentionally misrepresented their intention to pay Plaintiff any commissions and/or to issue to him, or entitle him to exercise, any options or warrants, and failed and omitted to disclose their prior course of action in similarly terminating the employment of one or more prior employees similarly situated to Plaintiff also as the means to cut off and abrogate their right and entitlement to receive and benefit from similar economic compensation.

68.  Moreover, upon information and belief, prior to the execution of the Employment Agreement, Defendants secretly harbored a hidden agenda to terminate Plaintiff's employment at a time when he had substantially would become substantially responsible for generating new business with one or more accounts, but before those agreements or arrangements might become definitive and fixed so as to avoid the payment of commissions and other compensation; and for the reason that Perla subsequently learned that Plaintiff was almost sixty years old.

69.  Defendants fraudulently induced Plaintiff to enter into the employment agreement by failing and omitting to disclose that they intended to terminate his employment after he had already done sufficient work and made sufficient efforts to essentially make the attainment of various strategic relationships and alliances and to obtain one or more accounts with "Credit Suisse", including an arrangement to provide Credit Suisse document discovery services, including replacing United States lawyers with India based lawyers, but prior to the actual date Defendants would have been required to pay such commissions and other compensation.

70.  By reason of the acts and omissions alleged in this Complaint, Defendants are liable to Plaintiff for federal securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.  As a result of, and in reasonable reliance on Defendants' fraud, committed in connection with the purchase and sale of securities, to wit the options and/or the warrants, Plaintiff has been damaged in the principal amount of not less than $1.5 million, and Plaintiffs is entitled to recover the foregoing sum from Defendants, jointly and severally, together with such

other and further relief as is just and proper, including an award of plaintiffs' reasonable attorneys' fees to the extent recoverable under applicable law.

72.     In addition, since the foregoing fraudulent misrepresentations breaches and related conduct was so willful and contumacious and constituted such a marked and depraved departure from what is commercially reasonable and the societal norm, alone and in conjunction with Defendants' conduct in relation to one or more other employees of the Company, similarly situated, Plaintiff is entitled to recover punitive and exemplary damages in the amount of not less than $1million, or such greater amount as may be determined at the a trial of this matter.

## COUNT IV

## AGAINST PERLA PURSUANT TO SECTION
## 20(a) OF THE EXCHANGE ACT

73.     Plaintiff repeats and realleges the allegations made in paragraphs 1 through 72 of this Complaint.

74.     By reason of his status as a controlling person in respect of Pangea, Perla is liable to Plaintiffs for Pangea's primary violations of Section 10(b) of the Exchange Act, and of Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act, as well as for his own primary violations thereof.

75.     By reason of the foregoing, Plaintiffs is entitled to a judgment against Perla for damages in an amount to be determined at trial, together with appropriate interest thereon, together with such other and further relief as is just and proper, including an award of plaintiffs' reasonable attorneys' fees to the extent recoverable under applicable law and/or punitive and exemplary damages.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.     On Count I of this Complaint, against all Defendant, Pangea, for such damages as may be proved at trial, together with appropriate interest thereon, for a declaratory judgment declaring the March 26, 2009 Non-Solicitation Agreement void and unenforceable, and for such

20

other and further relief as is just and proper, including the costs and disbursements of this action and an award of plaintiffs' reasonable attorneys' fees to the extent recoverable under applicable law, and an award of punitive and exemplary damages in such amount as may be determined at trial;

2. On Count II of this Complaint, against all Defendants, for damages in an amount to be determined at trial, together with appropriate interest thereon and such other and further relief as is just and proper, including the costs and disbursements of this action and an award of plaintiffs' reasonable attorneys' fees to the extent recoverable under applicable law, and an award of punitive and exemplary damages in such amount as may be determined at trial;

3. On Count III of this Complaint, against all defendants, jointly and severally, awarding Plaintiff damages in the amount of not less than $1.5 million, together with such other and further relief as is just and proper, including an award of plaintiffs' reasonable attorneys' fees to the extent recoverable under applicable law, together with appropriate interest thereon and such other and further relief as is just and proper, including the costs and disbursements of this action and an award of punitive damages in an amount to be determined at trial;

4. On Count IV of this Complaint, against Defendant Perla, awarding Plaintiff damages in the amount of not less than $1.5 million, together with appropriate interest thereon and such other and further relief as is just and proper, including the costs and disbursements of this action, and an award of punitive damages in an amount to be determined at trial;    and

5. For such other and different relief as this Court may determine is just and fair.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial with respect to all Counts of this Complaint triable before a jury as a matter of right.

Dated: Old Westbury, New York
April 29, 2007

JEFFREY L. ROSENBERG
& ASSOCIATES, L.L.C.

BY: _____
Jeffrey L. Rosenberg (JR-3597)
Attorneys for Plaintiff, Jay Koza
46 Morgan Drive,
Old Westbury, New York 11568
(516) 626-1325

**Exhibit A**



# PANGEA³

October 13, 2008

Jay Koza, Esq.
1884 Leslie Lane
Merrick, NY 11566
jkoza@optonline.net

Dear Jay:

Pangea3 LLC, a Delaware limited liability company (the "Company"), is pleased to offer you employment under the following terms:

1.    **Position.** You will serve as Senior Vice President & Managing Director – Discovery Services, reporting to the Company's US – based Co-CEO, and will be resident in the Company's New York office.   (David , titles are still to be determined)

Your responsibilities will include: generating and managing individual sales, on a national basis, to new and existing Clients (other than clients and prospects currently assigned to others); leading our discovery domain, including document review; and participating as a member of our senior management team. Additionally you will be responsible for developing strategic relationships (channel partnerships) in our discovery and litigation channel.

Your expected start date will be on or about October 20, 2008.  You will provide services to the Company on a full-time basis from the Company's New York City office, but periodic travel will be part of your job responsibilities.

2.    **Representation.** By signing this letter agreement, subject to the last sentence of this paragraph 2, you represent and warrant to the Company that you are under no contractual commitments, including without limitation confidentiality, non-disclosure, non-competition agreements or similar type of restrictive agreements, inconsistent with your obligations to the Company.  Notwithstanding the prior sentence, the Company acknowledges that you are under a limited non-solicitation agreement with Huron, your prior employer, for a term of 12 months after your termination of employment with Huron, and relating to approximately 12 corporations.

3.    **Salary.** For your services as Vice President, you will be paid a base salary at the annual rate of $195,000 before all customary payroll deductions, payable in installments in accordance with the Company's standard payroll practices for salaried employees as in effect from time to time.  In addition, the company will provide you with a Blackberry or other Smartphone of your reasonable choice, computer and printer, all for Company related matters.

4.    **Commissions.**

A.    **Commissions – Your Accounts:**   You will be entitled to payment of commissions as set forth in this paragraph 4.  For all new clients originated by exclusively or primarily you, and for all new business generated exclusively or primarily by you from existing clients, you will receive a commission of 7% of gross sales during the first year in which services are performed, 5% of gross sales in the second year in which services are performed and 3% of gross sales in the third year in

Case 2:09-cv-01761-TCP-ETB Document 1 Filed 04/29/09 Page 25 of 37 PageID #: 25



which services are performed, provided that you are employed with the Company at the time such commission is earned.

**B.      Commissions – Document Review:** For new clients purchasing document review services, or new document review business from existing clients, originated by you in conjunction with other members of the Company's sales team, as approved by me, the percentage commission payable to you will be 3.5% of gross sales during the first year in which document review services are performed.

**C.      Commissions – Others' Accounts or Jointly Acquired Accounts:** For new clients, or new business from existing clients, originated by you in conjunction with other members of the Company's sales team, the percentage commission payable to you will be reduced to an amount reasonably determined by the Company's Co-CEO.

**D.      Commission Draw:** During the first 12 month's of your employment with the Company, the Company will advance you $4,000 per month as a draw against your earned and to-be-earned commissions. Commissions payable to you at any point shall be reduced by the amount of the draw previously paid to you.

**E.      Warrants in Lieu of Commissions:** If, during the first 12 month's of your employment with the Company, you generate in excess of $3 million in revenue, you may elect to have the Company issue to you, in lieu of commissions on such excess revenue, warrants to purchase common stock of the Company (the "Warrants"). The Warrants shall be valued by the Company's Board of Directors, acting in good faith and in compliance with all applicable laws, and you shall receive an amount of warrants equal to the dollar value of the excess commissions that you would otherwise have been paid for generating revenue in excess of $3 million.

5.      <u>Stock Options</u>. You will be eligible to participate in the Pangea3 LLC standard employee stock option plan (the "Plan"). Promptly after your start date, you shall receive a grant of stock options (the "Options") to purchase 200,000 shares of common stock of Pangea3 LLC pursuant to the terms of the Plan, at a per share strike price of $0.20, which strike price is equivalent to the fair market value of one share of common stock on the date of grant. Your Options shall vest at the rate of 25% per year on each of the annual anniversary dates of your start date, all in accordance with the terms and conditions of the Plan. In addition to this initial grant, provided that you are employed by the Company on the one-year anniversary of your start date, you will be eligible for a grant or grants of additional Options, at a per share strike price equivalent to the fair market value of one share of common stock on the date of grant. Each of these additional options grants, if any, shall be subject to similar to four-year vesting arrangements, starting on the date of issuance of each such grant.

6.      <u>Benefits</u>. You will receive and participate in the same supplemental retirement, hospitalization, health plan (including health, vision, and dental coverage), life insurance plan, and disability plan as similarly situated Company personnel. If you choose to use an alternative health insurance provider, the company will reimburse you to the extent of the cost that the Company would have incurred had you accepted the health insurance plan provided by the Company. In addition, you will be entitled to three weeks annual paid vacation in accordance with the Company policy, 401K and other benefits as are provided to other eligible employees of the Company.

7.      <u>Period of Employment</u>. Your employment with the Company will be "at will," meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. While the terms of your employment and compensation will be subject to review, and may change form time to time at the discretion of the Company, the "at will" nature of your employment

-2-

Case 2:09-cv-01761-TCP-ETB Document 1 Filed 04/29/09 Page 26 of 37 PageID #: 26



will not and cannot change, except by an express written agreement signed by you and a Co-CEO of Pangea3 LLC.

8.    Outside Activities.  While you render services to the Company, you will not engage in any other gainful employment, business or activity without the written consent of the Company, provided that you may engage in personal investment and financial activities.  While you render services to the Company, you also will not assist any person or organization in competing with the Company, in preparing to compete with the Company or in hiring any employees of the Company or otherwise engage in any activity which represents a conflict of interest with the best interests of the Company.

9.    Proprietary Information and Inventions Agreement.  You will be required, as a condition to your employment with the Company, to sign a Confidentiality, Invention Rights, and a limited Non-Solicitation agreement, a copy of which is attached.

10.    Company Information.    By executing this letter agreement, you are hereby acknowledging that your decision to join the Company is based on full and adequate disclosure.  You hereby acknowledge that you have had full opportunity to make inquiries into the Company's background and current status and any other information (historical or current)—legal, financial or otherwise— and you have conducted such inquiry to your satisfaction verifying to your satisfaction the accuracy of any such information.  You hereby waive any claims against the Company or its officers regarding any such disclosed information or information which may have not been disclosed due to the lack of inquiry on your part or otherwise.

11.    Withholding Taxes.  All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

12.    Arbitration.  In the event of any dispute or claim relating to arising out of the employment relationship between you and the Company, you and the company agree that all such disputes shall be fully and finally resolved by binding arbitration conducted by the American Arbitration Association in New York, NY.  However, the parties agree that this arbitration provision shall not apply to any disputes or claims relating to or arising out of the misuse or misappropriation of the Company's trade secrets or proprietary information.

13.    Entire Agreement.  This letter agreement and the Confidentiality Agreement  contain all of the terms of your employment with the Company (including but not limited to any and all forms and amounts of compensation) and supersede any prior understandings or agreements, whether oral or written, between you and the Company.

14.    Amendment and Governing Law.  This letter agreement may not be amended or modified except by an express written agreement signed by you and a Co-CEO of Pangea3 LLC.  The terms of this letter agreement and the resolution of any disputes will be governed by, and construed and enforced in accordance with, the laws of the state of New York, without regard to any rules governing conflicts of laws.



We hope that you find the foregoing terms acceptable. You may indicate your agreement with these terms and accept this offer by signing and dating the enclosed duplicate original of this letter agreement. We look forward to having you join us.

Sincerely,

PANGEA3 LLC

By:

    Name:  David Perla
    Title:  Co-CEO

I have read and accept the terms of the employment offer:

Jay Koza

October 13, 2008

- 4 -

**Exhibit B**

MarketWatch

PRESS RELEASE

Jay Koza Joins Pangea3 to Enhance Discovery Services

Last update: 5:00 a.m. EST Nov. 19, 2008

NEW YORK, Nov 19, 2008 /PRNewswire via COMTEX/ -- Pangea3 LLC, the global leader in legal process outsourcing to corporate in-house counsel and U.S. law firms, is pleased to announce the appointment of Jay Koza as Senior Vice President & Managing Director of Discovery Services. Koza will join Pangea3's senior management team.

Koza is a pioneer in the litigation support industry and a knowledge leader in all aspects of the litigation vertical including electronic discovery, document review and information management. He will bring to the company vast experience as a consultative business development executive with strong relationships at major corporations and law firms.

Prior to joining Pangea3, Koza was a Senior Business Development Executive at Huron Consulting Group, concentrating on document review and e-discovery for corporations and major law firms. He served as the Senior Business Development Vice President with Superior Glacier, Inc., was a Founder and Senior Vice President of Uniscribe Professional Services, and has also held senior business development positions with Merrill Corporation and Aspen Systems Corporation.

"We are pleased to welcome Jay Koza to Pangea3. Jay has been the top performing business development executive in every position he has held," says David Perla, Co-CEO of Pangea3. "He is an entrepreneurial thinker with the ability to develop new business, expand the scope of existing business relationships and drive growth through increasing sales and improving productivity."

1

With experience in legal cost reduction related to the discovery aspects of litigation, Koza is well-positioned to assist companies who wish to shift their business focus from onshore to offshore legal outsourcing.

"As a recognized industry expert in the design and implementation of information management systems tailored to the needs of the legal community, Jay Koza will act as a trusted advisor to Pangea3's current clients and take our business model to a wide array of Fortune 500 corporations who stand to benefit from greater efficiencies and cost reduction through Pangea3's unique services," said Perla.

Koza holds a B.A. from Hofstra University, a J.D. from St. John's University, and is a member of the American Bar Association and New York Bar Association.

About Pangea3 LLC

Pangea3 is the leading provider of legal process outsourcing solutions to Fortune 1000 corporations, in-house counsel and law firms. Utilizing dedicated teams of U.S, U.K. and Indian attorneys, scientists and professionals, Pangea3 offers superior quality corporate, litigation, intellectual property and risk management services. Pangea3's advantage lies in its people, processes, Six Sigma compliance and technology -- to deliver US quality services at a compelling cost. For more information, visit http://www.pangea3.com.

SOURCE Pangea3 LLC

http://www.pangea3.com

Copyright (C) 2008 PR Newswire. All rights reserved



Top stories

| 12 45 PM today | U.S. stocks fall steeply as financial sector weighs |
| 10.52 AM today | U.S. consumer prices fall by the most since at least 1947 |
| 10 23 AM today | Housing starts fall to record-low level in October |



**Exhibit C**

# CONFIDENTIALITY INVENTIONS RIGHTS & NON-SOLICITATION AGREEMENT

This NON-DISCLOSURE & NON-SOLICITATION AGREEMENT (this "Agreement") is entered into as of October 13, 2008, by and between Pangea3 LLC ("Company") and Jay Koza ("Employee").

WHEREAS, Company and Employee have already entered into, or are contemplating entering into, an Employee/Employer relationship (the "Relationship"); and

WHEREAS, for the purpose of evaluating, entering into or performing his responsibilities under the Relationship (the "Purpose"), Employee may acquire from Company certain proprietary or confidential information of Company; and

WHEREAS, the parties acknowledge the importance to Company of safeguarding the confidentiality of such information.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Confidential Information.</u> (a) As used herein, "Confidential Information" shall mean, without limitation, (i) any idea, proposal, plan, information, procedure, technique, formula, technology or method of operation, any written or oral information of a proprietary nature, and any intellectual property owned or licensed by Company or relating to Company's or any of its principals' or affiliates' business, projects, operations, finances, activities or affairs, whether of a technical nature or not (including trade secrets, know-how, processes, and other technical or business information), or any proposed change thereto, (ii) any information in connection with or related to negotiations or discussions between or including the Company and the Employee with respect to the Purpose or the Relationship, including (without limitation) that the Company and the Employee are having such negotiations or discussions; (iii) any other information disclosed by Company and designated by Company as confidential, and (iv) and any other information that Employee knows or should know that Company wishes to keep confidential. By way of illustration, but not limitation, Confidential Information includes, without limitation, information regarding (i) all of the computer software and technologies, systems, structures, architectures, processes, formulae, compositions, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods, and information and databases developed, acquired, owned, produced or practiced at any time by Company or any affiliate thereof, software programs and documentation licensed by third parties to Company, and any other similar information or material, (ii) the business or financial condition of Company or directly or indirectly related to Company's companies or investments or its internal administrative, billing and accounting systems; (iii) customer lists, telemarketing lists, vendor lists, employee personnel information and policies and procedures; (iv) Company's products and services; (iv) business or financial information directly or indirectly related to Company's companies and investments and (v) other processes and procedures employed by Company.

(b) Notwithstanding the foregoing, Confidential Information shall not include information (i) currently in the public domain (other than as a result of a breach of this Agreement); (ii) in Employee's possession prior to its receipt from Company pursuant to this Agreement; or (iii) independently developed by Employee or known through a party other than Company, which party has no duty of confidentiality to Company, as demonstrated by written record.

2.   <u>Non-disclosure Obligations of Employee</u>.   Employee agrees to hold all Confidential Information in strict confidence and shall not, without the express written permission of Company, (i) disclose any Confidential Information to third parties or (ii) use Confidential Information for any purposes whatsoever, other than the Purpose. Without limiting the generality of the foregoing, Employee shall be permitted to disclose Confidential Information only to its officers, employees and consultants who have an absolute need to know such Confidential Information and who are informed of and agree in writing to be bound by this Agreement; provided that Employee will be liable for breach by any such person or entity.   Employee shall not make any copies of the Confidential Information except as necessary for its employees or consultants with a need to know. Any copies which are made shall be identified as belonging to Company and marked "confidential," "proprietary" or with a similar legend. Employee shall use its best efforts to assist Company in identifying and preventing any unauthorized use or disclosure of any Confidential Information.   Without limiting the foregoing, Employee shall immediately advise Company in the event that it learns or has reason to believe that any person who has had access to Confidential Information has violated or intends to violate the terms of this Agreement, and shall cooperate in seeking injunctive relief against any such person.

3.   <u>Title</u>. Title or the right to possess Confidential Information as between the parties shall remain in Company.  Employee shall not gain any interest or rights in or to the Confidential Information by virtue of its being disclosed to Employee for the limited purposes contemplated hereunder.

4.   <u>No Obligation of Disclosure: Return of Information</u>.  Company has no obligation to disclose Confidential Information to Employee.  Upon the consummation or sooner termination of the Relationship, or at any time upon Company's request, Employee shall promptly, at Company's option, either return or destroy all (or, if Company so requests, any part) of the Confidential Information previously disclosed, and all copies thereof, and Employee shall certify in writing as to its compliance with the foregoing.

5.   <u>Inventions.</u>

(a)   <u>Inventions Retained and Licensed</u>.  Employee has attached hereto, as <u>Exhibit A,</u> a list describing with particularity all inventions, original works of authorship, developments, improvements, and trade secrets which were made by Employee prior to the commencement of my employment (collectively referred to herein as "***Prior Inventions***"), which belong solely to him/her or belong to him/her jointly with another, which relate in any way to any of the Company's proposed Pangea3 related businesses, products or research and development, and which are not assigned to the Company hereunder by law or otherwise; or, if no such list is attached, Employee represents that there are no such Prior Inventions. Employee will not, in the course of the Employment Period, incorporate into a Company product, process or machine a Prior Invention owned by him/her or in which Employee has an interest, without the prior written consent of the Company; provided however, that Employee if he/she does so incorporate a Prior Invention, with the prior written consent of the Company, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention as part of or in connection with such product, process or machine.

(b)   <u>Assignment of Inventions</u>. Employee agrees that he/she will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws,

which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice during the Employment Period that (i) relate at the time of conception or development to the actual or demonstrably proposed business or research and development activities of the Company; (ii) result from or relate to any work performed for the Company, whether or not during normal business hours or on the premises of the Company's offices; or (iii) are developed through the use, either directly or indirectly, of Confidential Information (collectively referred to as *"Inventions"*). Employee further acknowledges that all Inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets which are made by him/her (solely or jointly with others) within the scope of and during the period of my employment with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary, unless regulated otherwise by law.

(c)     <u>Maintenance of Records</u>.  Employee agrees to keep and maintain adequate and current written records of all Inventions made by him/her (solely or jointly with others) during the term of my employment with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, and any other format. The records will be available to and remain the sole property of the Company at all times. Employee agrees not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business.

(d)     <u>Patent and Copyright Rights</u>.  Employee agrees to assist the Company, or its designee, at the Company's expense, in every way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company shall deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights, or other intellectual property rights relating thereto. Employee further agrees that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement until the expiration of the last such intellectual property right to expire in any country of the world. If the Company is unable because of my mental or physical incapacity or unavailability for any other reason to secure my signature to apply for or to pursue any application for any United States or forgoing patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then Employee hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or copyright registrations thereon with the same legal force and effect as if originally executed by him/her. Employee hereby waives and irrevocably quitclaims to the Company any and all claims, of any nature whatsoever, which Employee now or hereafter has for infringement of any and all proprietary rights assigned to the Company.

6.     <u>Returning Company Documents</u>.  Employee agrees that, at the time of the termination of my employment with the Company for any reason,, or at any other time at the request of the Company, Employee will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Confidential Information and all other documents, materials, information or property developed by him/her pursuant to my employment or otherwise belonging to the Company, its successors or assigns. Employee further agree that to any property situated on the Company's premises and owned

by the Company, including floppy disks, CDs or DVDs, zip drives, hard drives and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. In the event of the termination of my employment, Employee agrees to sign and deliver the *"Termination Certification"* attached hereto as Exhibit B.

     7.    <u>Disclosure of Agreement</u>. As long as it remains in effect, Employee will disclose the existence of this Agreement to any prospective employer, partner, co-venturer, investor or lender that can be reasonably viewed as a Competitor (as defined in Section 5 hereunder) prior to entering into an employment, partnership or other business relationship with such person or entity.

     8.    <u>Non-Solicitation</u>.

     (a)    During the Employment Term and for a period of twelve (12) months following the expiration or termination of the Employee's employment with the Company, whether such termination is voluntary or involuntary, Employee shall not, without the prior written consent of the Company, on behalf of himself or on behalf of any other person, business, enterprise or entity; (i) directly or indirectly solicit, divert or encourage any of the employees, agents, consultants or representatives to terminate his, her or its relationship with the Company, or hire any such employee, consultant or representative so solicited or encouraged; (ii) directly or indirectly on behalf of a Competitor solicit, divert or appropriate or attempt to solicit, divert or appropriate (a) any current client of the Company, or (b) any Potential or Prospective client of the Company with whom the Employee has had written or verbal contact as a result of his employment with the Company or during the course of his employment with the Company. For the purposes of this agreement a *"Potential or Prospective"* client shall mean any entity that is not a current client of the Company, but with respect to whom, before Employee's termination or resignation, Employee conducted, prepared or submitted, or assisted in conducting, preparing or submitting, any proposal or client development or marketing efforts on behalf of the Company. Competitor means any person, business, enterprise or legal entity, which is engaged or is seeking to engage in the Business within North America, Europe or Asia (a *"Competitor"*). *"Business"* shall mean the business of outsourcing legal services offshore (including but not limited to services relating to patents, commercial contracts, legal research, and litigation document review).

     (b)    Employee recognizes and acknowledges that the restrictions and limitations set forth in this Agreement are legitimate and fair in light of his/her access to Confidential Information, his/her substantial contacts with customers of the Company and the Company's need to develop and market its services and products. Employee further acknowledges that the customers and competitors of the Company are located throughout North America, Europe and Asia and that a business competitive with the Company may be carried on anywhere within these areas as a result of the unique use of Internet, telephonic, technologic and other advanced communications techniques. Therefore, Employee acknowledges that the geographical application of the provisions and restrictions contained in this Agreement are reasonable under the circumstances. Employee further acknowledges that: (i) in the event his/her employment with the Company terminates for any reason, he/she will be able to earn a livelihood without violating the foregoing restrictions and (ii) his/her ability to earn a livelihood without violating such restrictions is a material condition to his/her employment with the Company.

9.     <u>General</u>.

(a) This Agreement is neither intended to nor will it be construed as creating a joint venture, partnership or other form of business association between the parties, nor an obligation to buy or sell products using or incorporating the Confidential Information.

(b) The failure of Company to enforce any right resulting from breach of any provision of this Agreement by Employee will not be deemed a waiver of any right relating to a subsequent breach of such provision or of any other right hereunder.

(c) Employee agrees that, in the event of any breach of any provision hereof, Company will not have an adequate remedy in money or damages. Employee therefore agrees that, in such event, Company shall be entitled to obtain injunctive relief against such breach in any court of competent jurisdiction, without the necessity of posting a bond even if otherwise normally required. Such injunctive relief will in no way limit Company's right to obtain other remedies available under applicable law.

(d) This Agreement will be governed by the laws of the State of New York, without reference to conflict of laws principles.

(e) This Agreement constitutes the entire agreement between the parties with respect to the disclosure of Confidential Information and may not be amended except in a writing signed by a duly authorized representative of the respective parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

PANGEA3 LLC                                     JAY KOZA

By: _____                     _____

Name:
Title:

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED FROM SECTION 4

Title                          Date                          Identifying Number or
                                                             Brief Description


__X__ No inventions or improvements

_____ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: Jay Koza

Date:  October 13, 2008